**FIREMEN'S INSURANCE COMPANY OF WASHINGTON, D.C.,**
Plaintiff,

v.

**KLINE & SON CEMENT REPAIR, INC. et al., Defendants.**

**No. CIV. 3:06CV425.**

United States District Court,
E.D. Virginia,
Richmond Division.

Feb. 13, 2007.

---

James Wingate Barkley, Elisabeth M. Ayyildiz, Morin & Barkley, Charlottesville, VA, for Plaintiff.

Chad Matthew Rinard, Law Offices of Robert J. Barlow PLC, Fredericksburg, VA, John M. Claytor, Harman Claytor Corrigan & Willman, Elizabeth E. Stanulis Skilling, Richmond, VA, for Defendants.

Patricia Lewis, Richmond, VA, pro se.

### MEMORANDUM OPINION

DOHNAL, United States Magistrate Judge.

This matter is a declaratory judgment action that is before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1) on cross-motions for total or partial summary judgment (docket entry nos. 13, 15, and 18).[1] *See* 28 U.S.C. § 2201

*et seq.* Jurisdiction is invoked pursuant to 28 U.S.C. § 1332(a). Co–Defendant R.J. Smith General Contracting, Inc. ("R.J.Smith") contracted with Defendant Kline & Son Cement Repair, Inc. ("Kline") to apply an epoxy sealant to a concrete floor as part of a renovation project of a warehouse. Co–Defendant Patricia Lewis ("Lewis") has asserted a personal injury claim against both R.J. Smith and Kline alleging that she developed respiratory problems as a result of inhaling fumes from the sealant applied by Kline. (Compl.¶ 8.) The insurer of R.J. Smith and Kline, Firemen's Insurance Company of Washington, D.C. ("Firemen's"), asks this Court to declare that it has no duty to defend or indemnify the Defendants in Lewis' personal injury claim pursuant to a Total Pollution Exclusion clause provided for in the Policy. (Compl. ¶¶ 18–25; Firemen's Br. Supp. Mot. Summ. J. ("Firemen's Br.") at 4–7.) R.J. Smith and Kline counter that Lewis' claim is covered by the Policy because the Total Pollution Exclusion clause is ambiguous as applied to the facts of this case, and therefore must be construed against. Firemen's in favor of coverage. (Kline's Br. Supp. Mot. Summ. J. ("Kline's Br.") at 4–10 (docket entry no. 14); R.J. Smith's Mem. Supp. Mot. Part. Summ. J. ("R.J. Smith's Mem.") at 5–9 (docket entry no. 16).) The matter has been extensively briefed and the Court has entertained oral argument. The case is therefore "ripe" for resolution. For the reasons set forth herein, Firemen's motion is GRANTED and the Defendants' motions are DENIED.

### Undisputed Facts and Material Inferences

In January of 2005, R.J. Smith entered into a contract with the Virginia Depart-

---

1. Although some of the parties have only moved for partial summary judgment regarding part of the Plaintiff's requested relief, the

Court's resolution of the pending motions is dispositive of the case because all additional issues are rendered moot.

ment of Alcoholic Beverage Control ("ABC") to provide general contracting services in connection with the renovation of an ABC warehouse in Richmond, Virginia. (Stipulation of Uncontested Facts ("Facts") ¶ 2) (docket entry no. 17.) In February of that same year, Kline entered into a subcontract with R.J. Smith under which Kline agreed to perform work related to restoration of a concrete floor at the ABC warehouse. (Facts ¶ 4 & Ex. 2.) Kline is in the business of laying concrete floors and, relevant to the current proceeding, applying protective sealants on top of the concrete. (Kline's Br. at 2.) As such, Kline contracted to apply and did apply an epoxy and eurathane [2] protective sealant to the concrete floor at the warehouse on April 8 or 9, 2005. (Facts ¶ 5.)

Firemen's issued a commercial general liability insurance policy (the "Policy") to Kline for the period September 10, 2004, to September 10, 2005, in which Kline was a named insured and R.J. Smith qualified as an additional insured.[3] (Facts ¶ 1.) On August 1, 2005, Lewis (an employee at the warehouse), asserted a personal injury claim against both Kline and R.J. Smith alleging that she developed respiratory problems on April 11, 2005, as a result of inhaling fumes from the epoxy applied by Kline. (Facts ¶¶ 5, 7–8.) More specifically, Lewis alleged that she inhaled the fumes from the epoxy/eurathane while she was in her office located on a separate floor above the warehouse. (Firemen's Br. at 3, ¶ 10.) Although Lewis has not yet filed a formal action, her personal injury claim—as manifested in both her sworn deposition testimony and her related demand for settlement—is the basis for the present insurance coverage dispute.

R.J. Smith has sought indemnity from Kline for Lewis' claim pursuant to the Subcontract executed between Kline and R.J. Smith. (Compl. ¶ 9; R.J. Smith's Answer ¶ 8.) In turn, both Kline (as the named insured) and R.J. Smith (as the additional insured) seek a defense and indemnification from Firemen's under the Policy for the claims made by Lewis. (Compl. ¶¶ 11–12; R.J. Smith's Answer ¶¶ 9–10.)

The Policy requires Firemen's to indemnify those sums the insureds become legally obligated to pay due to "bodily injury" resulting from an "occurrence" (*i.e.,* an accident) that took place during the policy period. (Facts, Ex. 1 (the "Policy"), at FIC000049.)[4] The parties concede that Lewis' claim alleges "bodily injury" caused by an "occurrence" within the meaning of

---

**2.** The parties agree that the eurathane used by Kline contained Eucothane VOX. (Facts ¶ 6 & Ex. 3.) The Material Safety Data Sheet indicates that Eucothane VOX "[m]ay cause moderate irritation to the respiratory system" and that its "[v]apor and/or mist may irritate [the] nose and throat." *Id.*

**3.** R.J. Smith seeks a declaration that it is an additional insured under the Policy issued by Firemen's to Kline. (R.J. Smith's Mem. at 5.) Firemen's appears to concede this point as it does not directly contest the issue. Even if the issue were contested, however, R.J. Smith's status as an additional insured is clear. The Policy extends additional insured status to "[a]ny person(s) or organization(s) if required by written contract, agreement or permit, that such person or organization be added as an additional insured on [Kline's] policy." *See* Facts, Ex. 1, at FIC000047*.

Under the endorsement, such persons or organizations are afforded additional insured status for "liability arising out of...[Kline's] ongoing operations for that person or organization." *Id.* The Subcontract required Kline to name R.J. Smith as an additional insured under the Policy, (*Id.,* Ex. B, Article 13 & Attachment B), and Lewis' claim against R.J. Smith arises out of "[Kline's] ongoing operations" for R.J. Smith, *i.e.,* applying the sealant. Thus, R.J. Smith is an additional insured under the Policy for the underlying claim.

**4.** Citation to the applicable Policy provisions follows that utilized by the parties in their varying briefs and pleadings filed with the Court. "Numerous pages of Exhibit 1 to the Stipulation of Uncontested Facts contain print on both sides of the page; however, only the front-side of each page contains an FIC

the Policy. (Facts ¶ 9.) Thus, Firemen's must provide coverage to the insureds for Lewis' claim unless her claim is otherwise excluded from coverage.

The Policy excludes a number of "occurrences" from coverage, including damages resulting from pollution. Central to the resolution of this case is the Total Pollution Exclusion clause ("Pollution Exclusion") contained in the Policy which provides, in pertinent part:

**TOTAL POLLUTION EXCLUSION...**

This insurance does not apply to:

. . . . .

**f. Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

(The Policy at FIC000059.) In pertinent part, the Policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at FIC000056.

### Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering whether to grant a motion for summary judgment, the court must assess the evidence offered by both parties and "determine whether there is a genuine

issue for trial" after viewing the evidence in. the light most favorable to the non-moving party and resolving all factual disputes in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Since this Court is faced with cross-motions for summary judgment, the Court must review each motion separately on its own merits. *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.2003) (citation omitted). When considering each motion, the Court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing that motion. *Id.* (citation omitted).

To defeat a summary judgment motion, the non-moving party may not rest upon mere allegations or denials, but must "set forth specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, the Court must decide if the evidence when viewed in the light most favorable to the non-moving party "presents a sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. Resolution of the instant matter is "especially appropriate...because the construction of insurance contracts is a legal question well suited for resolution by the court." *W. Am. Ins. Co. v. Johns Bros., Inc.,* 435 F.Supp.2d 511, 513–14 (E.D.Va.2006) (citation omitted).

### Analysis

**1. The Facts of This Case Present a Justiciable "Case or Controversy"**

Article III of the United States Constitution limits the exercise of judicial power

Bates number." (R.J. Smith's Mem. at 3, n. 2.) For purposes of this Memorandum Opinion, the Court will therefore cite the Bates number indicated on the front-side of the

page with \* to indicate that the relevant provision is found on the back-side of the referenced page. *Id. See, e.g.,* Footnote 3, *supra.*

to "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1. In accordance with this constitutional mandate, the Federal Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction...any court of the United States...may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Court raised the issue of justiciability *sua sponte* when it first learned during oral argument that Lewis has not yet formally filed a personal injury suit against the alleged tortfeasors, Kline and R.J. Smith. Without a lawsuit being filed, the Court questioned whether Firemen's Complaint set forth a "case of actual controversy" sufficient to support the action seeking declaratory relief. The issue is of particular significance in light of the fact that, under Virginia law, there is constant reference to an insurer's duty to defend only when an underlying "*complaint* alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." *Va. Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.*, 252 Va. 265, 475 S.E.2d 264, 265 (1996) (emphasis added) (quoting *Lerner v. Safeco*, 219 Va. 101, 245 S.E.2d 249, 251 (1978)). Indeed, "such a provision [to defend] places no obligation on the insurer to defend an action against an insured when, *under the allegations of the complaint*, it would not be liable under its contract for any recovery therein had." *Lerner*, 245 S.E.2d at 251 (citation omitted and emphasis added). As Lewis has not filed an underlying lawsuit, the initial question before the Court is whether an actual controversy exists such that a declaratory judgment can be granted, or whether such a judgment would amount to a mere impermissible advisory opinion based on hypothetical facts.

A court's discretion to grant declaratory relief "should be liberally exercised to effectuate the purposes of the [Declaratory Judgment Act] and thereby afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir.1937) (citation omitted). Although Supreme Court precedent has not "draw[n] the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not," *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. ——, 127 S.Ct. 764, 166 L.Ed.2d 604, 614 (2007), the Court has stated that the requirement will be met where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," *id.*, 127 S.Ct. 764, 166 L.Ed.2d at 615 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). The Fourth Circuit follows this general premise, noting that "a declaratory judgment action is appropriate when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and...when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Penn–America Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir.2004) (citations and internal quotation marks omitted). Although Virginia law has not addressed the issue of whether a declaratory judgment action may be maintained by an insurer against its insured where an injured third-party has not formally filed a lawsuit against the insured, various courts from other jurisdictions have answered the question in the affirmative.

In *T.H.E. Ins. Co. v. Dowdy's Amusement Park*, 820 F.Supp. 238 (E.D.N.C. 1993), a minor child and her father were involved in an accident at the defendant's

amusement park in North Carolina. *Id.* at 239. Upon returning to their home state, the third-parties retained an attorney to represent them in making a claim for the child's injuries. *Id.* The attorney notified the amusement park, and later the amusement park's insurer, that the third-parties intended to proceed with a claim. *Id.* Upon receipt of the notice, the insurer filed a declaratory judgment complaint alleging, *inter alia,* that certain exclusions in the policy would nullify its duty to defend any suit "which *may* be brought for the [third-parties'] injuries," even though no complaint against its insured had yet been filed. *Id.* (emphasis added). The insured moved to dismiss the insurer's complaint for lack of subject matter jurisdiction, contending that the complaint did not set out a "case of actual controversy" sufficient to support a declaratory judgment. *Id.* at 238.

The court held that the insurer's potential duty to defend or settle the case was sufficiently at issue to constitute an actual controversy for purposes of the Declaratory Judgment Act. The court noted the "realities of the claims adjustment process" in making its decision:

> Until it is clear whether his injuries are covered by the potential defendant's liability policy, the injured third party does not know whether to conduct settlement negotiations with the defendant or the insurer. The insurer is on actual notice of the [third-parties'] injuries, and unless [the insurer] can obtain declaratory relief it must maintain a claim file until the expiration of the statute of limitations for those injuries. Moreover, the insurer is faced with the choice between undertaking potentially costly investigation and settlement negotiations on a claim for which there may be no coverage and waiting until suit is filed and losing the opportunity to investigate potential liability defenses while the evidence is still fresh. Finally, despite the

defendant's opposition to this suit, a coverage determination now, rather than after suit is filed, permits defendant to decide whether it should pursue settlement on its own initiative or permit the insurer to conduct all negotiations.

*Id.* at 239. The court continued:

> It is much more sensible to permit resolution of coverage issues when the dispute first arises than to require all parties to endure unnecessary uncertainty and expense until a third-party complaint has been filed. *Where a settlement demand has been made,* the presence or absence of coverage is critical for all parties in determining how to proceed, and a disputed coverage issue is a sufficiently live controversy to make exercising jurisdiction appropriate under 28 U.S.C. § 2201.

*Id.* at 240 (emphasis added).

Other courts have employed similar reasoning to conclude that a third-party's failure to file suit against an insured does not automatically preclude an insurer from seeking a declaratory judgment against the insured. *See, e.g., Aetna Cas. & Sur. Co. v. General Dynamics Corp.,* 968 F.2d 707, 711 (8th Cir.1992) (case ripe for declaratory adjudication even where no suits had been filed nor any settlements reached with respect to four of insured's sixteen environmental sites because insured made *"a clear demand for payment of defense and indemnity costs with respect to each of the four sites,"* and because the insurance company disputed those demands) (emphasis added); *Icarom, PLC v. Howard County, Md.,* 904 F.Supp. 454, 458 (D.Md.1995) (finding justiciable controversy sufficient to support declaratory judgment where "[a]ll the salient facts establishing a right to declaratory relief have already occurred," and where the insured had begun *"the process of negotiating settlements"* with various injured third-par-

ties) (emphasis added); *State Farm Mut. Auto. Ins. Co. v. Sampson*, 305 F.Supp. 50, 52 (M.D.Fla.1969) (even though third-party had not filed suit against insured, it was "obvious that suit [was] imminent pending the outcome of this litigation and...the lack of a pending claim or a court suit by the injured parties should not be a barrier to jurisdiction and a declaration of rights in this action."); *Manhattan Fire & Marine Ins. Co. v. Nassau Estates II*, 217 F.Supp. 196, 198 (D.N.J.1963) (finding justiciable controversy where the "insurer is on actual notice of the occurrence of the accident and of the severity of the injuries."). *But see Union Ins. Co. v. Soleil Group, Inc.*, 465 F.Supp.2d 567, 574 (D.S.C.2006) (holding that there was no case or controversy between insurer and insured where no suit had been filed by the third-party claimant); *Ga. Am. Ins. Co. v. Johnson*, 712 F.Supp. 530, 532 (S.D.Miss.1989) (same). The majority of jurisdictions to have addressed the issue, therefore, conclude that a third party's failure to file an underlying lawsuit is not a *per se* barrier to the maintenance of a declaratory judgment action by an insurer against its insured.

Moreover, Firemen's directs this Court's attention to an oft-cited treatise which cautions that some courts erroneously assume "that the issue between the company and the injured person is not ripe for adjudication because no judgment has yet been obtained by or against the insured or because there is only a 'contingent future possibility of disputes,' or because...no suit has yet been brought." Edwin Borchard, *Declaratory Judgments* 637 (2d ed.1941). Professor Borchard justifies his conclusion of justiciability as follows:

This [would] defeat one of the main purposes of the declaratory judgment, namely, to remove clouds from legal relations before they have become completed attacks or "disputes already ripened." If there is human probability that danger or jeopardy or prejudice impends from a certain quarter, a sufficient legal interest has been created to warrant a removal of the danger or threat. Naturally, some perspicacity is required to determine whether such danger is hypothetical or imaginary only or whether it is actual and material. It seems clear that the probable, practically inevitable, claims of an injured person under the usual casualty policy can never be deemed merely hypothetical or insufficiently ripe for an adjudication of the question of insurer's liability.

*Id.* Thus, "several courts have failed to observe that even a *potential* claim, such as the *probable* claim of an injured person against the insured and the insurance company, is sufficient to cause fear and jeopardy and thus to warrant the institution of an action for a declaration of non-liability." *Id.* at 636 (emphasis added).

■ The Court finds persuasive the reasoning of *T.H.E. Ins. Co.* and those cases and treatises utilizing a similar analysis to find the existence of a justiciable controversy. Although Lewis has not filed suit, she has nonetheless asserted a claim against both R.J. Smith and Kline sufficient to create a justiciable "case or controversy" that this Court may resolve under the Declaratory Judgment Act. Lewis' testimony in her October 17, 2006, deposition clearly reflects an intent to continue pursuing her claim against Kline and R.J. Smith, including filing suit. (Firemen's Br. on Justiciability of Declaratory J. Action, Ex. 1 ("Lewis Dep.") at 43:1–5, Oct. 17, 2006) (docket entry no. 30.) Moreover, Firemen's, Kline and R.J. Smith have all stipulated to the relevant facts necessary to determine the outcome of the present declaratory judgment suit, and the stipulated facts corroborate Lewis' deposition testimony.

Indeed, Lewis testified extensively in her deposition as to the date of the occurrence and the events leading to her alleged injuries. (Lewis Dep. 11:21–13:8 (detailing the events of April 11, 2005); 15:1–16 ("And I told [my supervisor the fumes] were making me sick, they were giving me a headache, making me nauseous, my chest was hurting, my breathing was getting uncomfortable, I was even getting lightheaded from them.")) She identified the location of her office from where she inhaled the fumes in relation to where the sealant was applied (*Id.* 8:11–21), indicated that the sealant contained Eucothane VOX (*Id.* 20:17–21:14), confirmed that her supervisor told her the fumes "you all have been inhaling are toxic" (*Id.* 20:14–16), and affirmed her belief that the fumes caused her respiratory injuries in the form of pneumonitis and bronchitis (*Id.* 26:6–12; 31:20–32:14). Significantly, Lewis presented a claim for her injuries to Kline and R.J. Smith (*Id.* 26–13–27:7), and demanded settlement from the insureds in the amount of $75,000 (*Id.* 29:12–30:10). *See T.H.E. Ins. Co.,* 820 F.Supp. at 240 ("*Where a settlement demand has been made,* the presence or absence of coverage is critical for all parties in determining how to proceed, and a disputed coverage issue is a sufficiently live controversy to make exercising jurisdiction appropriate under" the Declaratory Judgment Act) (emphasis added); *Icarom,* 904 F.Supp. at 458 (justiciable controversy exists where "[a]ll the salient facts establishing a right to declaratory relief have already occurred," and where the insured had begun "*the process of negotiating settlements*" with various injured third-parties) (emphasis added). A "case of actual controversy," therefore, exists.

Even when there has been no formal institution of legal proceedings against the insured, the particular issue of coverage under the policy as to which a declaration is sought may be sufficiently ripe for a declaratory judgment action to lie. Indeed, "the probable claim of an injured person against the insured and insurer is sufficient to cause jeopardy and thus to warrant commencement of an action for a declaration of no liability. Although a claim may be contingent, in the sense that it has not yet been brought, when facts and circumstances indicate that it is likely to be brought, there is justification for making the injured person, who has a real and substantive though not immediate interest, a party-defendant in an action for a declaration that the insurer is not liable under the policy." Allison E. Butler, 22 *Holmes' Appleman on Insurance 2d* § 144.2[A][2][a] at 573–74 (Matthew Bender, Inc.2003 and Cumm. Supp.2006) (internal quotation marks and citations omitted); *see also* Lee R. Russ & Thomas F. Segalla, 16 *Couch on Insurance 3d* § 227:39 at 227–53, 54 (West 2005) (citing *Icarom, supra,* and noting that "[a] finding that pre-claim declaratory judgments are ripe is particularly likely as to cases involving the insured's potential liability for pollution...in which the filing of a formal suit may never take place, the facts on which liability will be determined tend to be fixed, and there is a great deal of public interest in determining who will be liable and in getting the damage repaired.").

Co-defendant R.J. Smith asks the Court to stay this matter until Lewis files suit, or until the statute of limitations for her claim expires. (R.J. Smith's Resp. Firemen's Br. on Justiciability at 2) (docket entry no. 32.) But the granting of such a request would compel Firemen's to incur additional costs and, more importantly, declaratory relief would serve a meaningful purpose by clarifying the legal responsibilities of the parties, the insureds (including R.J. Smith) having already demanded a defense and indemnity from Firemen's. To request a defense from an insurance company, on the one hand, and to then

argue that the insurance company cannot maintain an action to determine whether such a duty, in fact, exists *after* the insurance company *and* the insured have stipulated to the facts necessary to resolve such a duty, is, at the very least, illogical.

The stipulations of Firemen's, Kline, and R.J. Smith, as well as the deposition testimony of Lewis, establish as undisputed the facts necessary for a coverage determination in the matter. Lewis' claim submission to Kline and R.J. Smith for her alleged injuries, as well as her settlement demand submitted to the same insureds, combined with her sworn deposition testimony, establish "a case of actual controversy" sufficient to confer subject matter jurisdiction on this Court for purposes of the Declaratory Judgment Act. Such a conclusion is especially appropriate where a coverage determination will resolve the issue of Firemen's duties under the Policy, and eliminate the parties' uncertainty as to their rights and responsibilities. Therefore, the case is sufficiently ripe for adjudication because "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Medimmune*, 127 S.Ct. 764, 166 L.Ed.2d at 614 (citation omitted).

## 2. Does Firemen's Owe its Insureds a Defense Given the Undisputed Facts and Policy Language At Issue?

■ The parties agree that Virginia law controls where, as here, subject matter jurisdiction is premised on diversity of citizenship, and the Court must apply the substantive law of the forum state (Virginia), including the forum state's choice of law rules. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Hitachi Credit Am.*

*Corp. v. Signet Bank*, 166 F.3d 614, 623–24 (4th Cir.1999) (citation omitted). Under Virginia law, "the law of the place where an insurance contract is written and delivered controls issues as to its coverage." *See Buchanan v. Doe*, 246 Va. 67, 431 S.E.2d 289, 291 (1993) (citation omitted). Because it is reasonable to infer (and is not contested by the parties) that the insurance contract in issue was delivered to the insureds in Virginia, Virginia law governs.

■ Whether Firemen's owes Kline and R.J. Smith a duty to defend and indemnify Lewis' personal injury claim primarily depends on whether such language is unambiguously provided for in the subject insurance Policy. More specifically, the issue to be decided is whether the Pollution Exclusion clause in the Policy is ambiguous as applied to the facts conveyed by Lewis in her deposition testimony, and to those facts otherwise undisputed by the parties. If the Pollution Exclusion clause is, in fact, ambiguous, the ambiguity must be resolved against Firemen's and in favor of coverage for the insureds. *See Lincoln Nat'l Life Ins. Co. v. Commonwealth Corrugated Container Corp.*, 229 Va. 132, 327 S.E.2d 98, 101 (1985).

■ Controlling Virginia law is clear and well-settled on the governing standard for interpreting contracts, including insurance policies. Virginia strictly adheres to the "plain meaning" rule: "where an agreement is complete on its face and is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself...because the writing is the repository of final agreement between the parties." *See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 405 (4th Cir.1998) (quoting *Lerner v. Gudelsky Co.*, 230 Va. 124, 334 S.E.2d 579, 584 (1985)). Contract language is deemed ambiguous "when it may

be understood in more than one way or when it refers to two or more things at the same time." *Pac. Ins. Co.*, 148 F.3d at 405 (quoting *Granite State Ins. Co. v. Bottoms*, 243 Va. 228, 415 S.E.2d 131, 134 (1992)). Language will not be deemed ambiguous, however, merely because the parties disagree as to the meaning of the terms used. *Johns Bros.*, 435 F.Supp.2d at 514 (citation and quotation marks omitted). Importantly,

> [e]xclusionary language in an insurance policy will be construed most strongly against the insurer and the burden is upon the insurer to prove that an exclusion applies. Reasonable exclusions not in conflict with statute will be enforced, but it is incumbent upon the insurer to employ exclusionary language that is clear and unambiguous.

*Transcon. Ins. Co. v. RBMW, Inc.*, 262 Va. 502, 551 S.E.2d 313, 318 (2001) (citation omitted). Thus, Firemen's bears the burden of proving that the Policy's Total Pollution Exclusion clause clearly and unambiguously excludes Lewis' personal injury claim from coverage in this case.

### A. Are Epoxy/Eurathane Fumes "Pollutants" Under the Total Pollution Exclusion?

The insureds argue that the definition of "pollutant" in the Policy is ambiguous and therefore unenforceable as applied to Lewis' personal injury allegations. The word "pollutant" has received a great deal of scrutiny by the courts, and whether a substance is a "pollutant" is a fact specific inquiry. In pertinent part, the definition section of the Policy defines a "pollutant" as:

> any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.

(The Policy at FIC000056.) In *City of Chesapeake v. States Self–Insurers Risk Retention Group, Inc.*, 271 Va. 574, 628 S.E.2d 539, 540 (2006), the Supreme Court of Virginia faced the certified question of whether a similar absolute pollution exclusion containing an identical definition of the term "pollutant" barred coverage for damages allegedly caused by the release of trihalomethanes ("THMs") into a city's water supply. Relying on a federal environmental statute and accompanying regulations designed to regulate drinking water, the Court concluded that because the federal statute defined THMs as contaminants, and because the insurance policy defined "pollutants" to include "contaminants," THMs were pollutants as that term was defined in the policy. *Id.* at 541.

Relying on *City of Chesapeake*, Firemen's contends that the epoxy/eurathane floor sealant is a "pollutant" because it contains toxic substances that are classified as "hazardous air pollutants" under the Clean Air Act, 42 U.S.C. § 7412(b). (Firemen's Resp. Mot. Part. Summ. J. of R.J. Smith ("Firemen's Resp.") at 5.) However, the applicability of the Clean Air Act is not an issue in this case. In *City of Chesapeake*, the federal statute used by the Court to define the term "contaminant" was directly implicated by the underlying lawsuit which alleged pollution of the City's drinking water. Here, by contrast, Lewis' allegations charge no violation of the Clean Air Act, or any other federal statute for that matter, and any reference to a particular federal environmental statute is therefore rendered unnecessary and inappropriate.

The Norfolk Division of the Court recently confronted the issue of whether heating oil is a "pollutant" under an identical definition to that confronted by the Supreme Court of Virginia in *City of Chesapeake*, as well as that at issue here. *See Johns Bros.*, 435 F.Supp.2d at 514. Because there was "no statute directly implicated by the facts" in *Johns Bros.*, the

district court concluded that, as with this case, it could not reference various statutes in making its analysis of whether heating oil was a "pollutant." *See id.* at 515–16. The court in *Johns Bros.* noted the Supreme Court of Virginia's pronouncement that inquiry into caselaw from other jurisdictions is "unnecessary...[if] the law of the Commonwealth and the plain language of the insurance policy provide the answer...." *Id.* at 516 (quoting *City of Chesapeake,* 628 S.E.2d at 542). Accordingly, the court concluded that it was required to "consider the language of the policy, giving words that are not expressly defined their usual, ordinary, and popular meaning, to determine if the plain language of the policy provides the answer." *Johns Bros.,* 435 F.Supp.2d at 516 (quoting *City of Chesapeake,* 628 S.E.2d at 541) (citation and internal quotation marks omitted). The court ultimately concluded that the ordinary meaning of the word "contaminant" encompassed fuel oil leaking out of fuel lines into the soil, *Johns Bros.,* 435 F.Supp.2d at 516, and, furthermore, a plain reading of the entire pollution exclusion clause in the subject policy supported the court's conclusion that heating oil was to be considered a pollutant pursuant to relevant policy language. *Id.* at 517. A similar analysis is appropriate in this case to determine whether the fumes emanating from the epoxy/eurathane sealant used by Kline were "pollutants" as that term is defined in the Pollution Exclusion clause of the subject Policy.

■ Pursuant to the Policy, a "pollutant" includes "any...liquid, gaseous...*irritant* or contaminant...including...*fumes* ...[and] chemicals...." (The Policy at FIC000056) (emphasis added). Certainly, the noxious fumes emanating from the epoxy sealant were "irritant[s] or contaminant[s]" as that term is used in the Policy, and as those words are ordinarily understood. In this regard, included as an exhibit to the Uncontested Facts is the Material Safety Data Sheet for Eucothane VOX, a chemical found in the eurathane sealant applied by Kline to the warehouse floor. (Facts ¶ 6 & Ex. 3 (the "Report".)) The Report indicates that Eucothane VOX contains various "hazardous ingredients" including Xylene (prolonged exposure to which may cause "heart muscle sensitization and arrhythmia") and Ethylbenzene (which has been classified by the International Agency for Research on Cancer "as a possible human carcinogen"). *Id.* The Report notes further that Eucothane VOX "[m]ay cause moderate *irritation* to the respiratory system," that its [v]apor and/or mist may *"irritate* [the] nose and throat," and directs affected persons on no less than two occasions to "move to fresh air" if the substance is inhaled. *Id.* (emphasis added). Finally, under the heading "Exposure Controls/Personal Protection," the Report cautions users of the chemical to wear a "self-contained breathing apparatus or positive pressure air supplied respirator with full face mask to reduce exposure to...vapors...." *Id.*

Thus, the sealant at issue is not innocuous, and its harmful effects are well known. According to the Report, the sealant is an irritant. It may cause moderate irritation to the respiratory system, its vapor may irritate the nose and throat, and persons using the product should guard against inhaling its harmful fumes and vapors. In addition, when canisters of a liquid or other compound are brought onto premises, opened, and the material, upon exposure to the air or after application to the surface, causes noxious fumes to emanate and make a person nauseous, dizzy, or otherwise feel ill (as Lewis testified was the case), the fumes are clearly pollutants. The definition of "pollutant" in the Policy, including as it does "any...irritant or contaminant, including...fumes," clearly and unambiguously applies to the product in question.

The insureds' argument that the phrase "any irritant or contaminant" is too broad to meaningfully define the term "pollutants," (R.J. Smith's Mem. at 7), is equally unavailing. As at least one court has explained:

The pertinent inquiry is not, as [the insured] contends, whether the policy's definition of "pollutant" is so broad that virtually any substance, including many useful and necessary products, could be said to come within its ambit. Rather, guided by the principle that ambiguity (or lack thereof) is to be determined by reference to a particular set of facts, we focus on the specific product at issue.

*Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 107 (1999) (holding policy definition of "pollutant" identical to that of the present case clearly and unambiguously applied to sealant used on concrete floor). The ordinary meaning of the word "irritant" encompasses toxic fumes emanating from a chemical that has been applied to a floor, where that chemical is specifically labeled by its manufacturer as causing "irritation to the respiratory system" when inhaled, is inundated with various "hazardous substances" some of which pose grave health risks to persons coming into contact with the fumes of the chemical, and which suggests that its applicators take precautionary measures when using the product. The sealant fumes in this instance certainly fall within the definition of gaseous substances, vapors, and fumes, and the substances composing the sealant are plainly chemicals.

Properly framed, in evaluating Lewis's claims and the facts alleged therein, as well as the pertinent Policy provisions, the term "pollutant" unambiguously includes the fumes released from the epoxy/eurathane sealant Kline applied to the warehouse floor. *See Johns Bros.*, 435 F.Supp.2d at 515–517 (holding that heating oil is a "pollutant" under identical policy

language after considering the language of the policy, giving words that are not expressly defined their "usual, ordinary, and popular meaning."); *see also Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 775, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985) (referring to "chemical irritants" that aggravated the plaintiff's bronchitic condition); *Assicurazioni Generali, S.p.A. v. Neil,* 160 F.3d 997, 1000 (4th Cir.1998) (applying Maryland law) (Under policy defining "pollutants" as "smoke, vapors, soot, fumes, acids, sounds, alkalies, chemicals, liquids, solids, gases, thermal pollutants and all other irritants or contaminations," holding that "carbon monoxide—whether considered a 'fume,' 'vapor,' or 'gas'—plainly falls within this policy definition of 'pollutant.'").

**B. Are the Terms "Discharge," "Dispersal," "Seepage," "Migration," "Release," and "Escape" Ambiguous in the Context of This Case?**

Given that epoxy/eurathane is a "pollutant" as that term is defined in the Policy, the Exclusion clause will only apply to claims for " '[b]odily injury' . . . which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of [the epoxy/eurathane fumes] at any time." *See* The Policy at FIC00059. In *City of Chesapeake*, the Supreme Court of Virginia addressed the applicability of a similar pollution exclusion to bodily injury claims arising from traditional environmental pollution over a widespread area, *i.e.*, harm arising from a byproduct created as a result of the City's water treatment process. 628 S.E.2d at 541 (noting that THMs were released whenever a customer turned on the faucet); *see id.* (plaintiff alleged bodily injury due to exposure of THMs because "THMs . . . are disposed of and released *into the domestic water* at or about the City's water treatment facility . . . .") (em-

phasis added). The Court held that the words "discharge, dispersal, seepage, migration, release or escape" were unambiguous as applied to the facts because the City had conceded that THMs were "released" when a customer turned on the faucet in a residence or business. *Id.* Moreover, the plaintiff in *City of Chesapeake* alleged in her complaint that THMs were "disposed of and released" into the water, and she also alleged a "discharge" of THMs by the City. *Id.* The Court concluded that these allegations brought "the underlying suit...into the ambit of the exclusion provision...because the legal fees and costs were from a suit involving 'bodily injury...arising out of the actual, *alleged*, or threatened discharge, dispersal, seepage, migration, release or escape of pollutants.'" *Id.* (emphasis in original).

Here, however, Lewis' alleged injury arose from a localized incident resulting from the application of a floor sealant as intended and used in the ordinary course of the insured's business. In other words, the incident in this case, unlike that presented in *City of Chesapeake*, does not involve events giving rise to what is commonly thought of as "traditional," "environmental," or "industrial" pollution. Because the Supreme Court of Virginia has "spoken neither directly nor indirectly on

the particular issue..., [this Court] is called upon to predict how that court would rule if presented with the issue. In so predicting how that court would decide the issue, [this Court] may consider the teachings of treatises, as well as the practices of other states." *St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 365 F.3d 263, 272 (4th Cir.2004) (citations and internal quotation marks omitted).

### I. State and Federal Courts Are Split on Whether the Pollution Exclusion is Either Ambiguous or Unambiguous

Jurisdictions are split as to the meaning of the terms "discharge, dispersal, seepage, migration, release or escape." "These method of travel requirements have been both narrowly and broadly construed by various jurisdictions, usually depending upon whether that jurisdiction views pollution as limited to traditional industrial environmental pollution or not." Lee R. Russ & Thomas F. Segalla, 9 *Couch on Insurance 3d* § 127:9 at 127–28 (West 2005). Numerous courts have held that a pollution exclusion bars coverage for all injuries caused by the release of pollutants, even where the pollutant is dispersed into a confined or indoor area.[5] *Id.*

---

5. *See, e.g., Cont'l Cas. Co. v. Advance Terrazzo & Tile Co., Inc.*, 462 F.3d 1002 (8th Cir.2006) (applying Minnesota law) (pollution exclusion unambiguously applied to bar coverage for injuries resulting from exposure to carbon monoxide fumes emanating from terrazzo floor grinders); *Mark I Restoration SVC v. Assurance Co. of Am.*, 112 Fed.Appx. 153 (3d Cir.2004) (unpublished) (applying Pennsylvania law) (deodorizing chemicals used in skunk-infested home); *Nat'l Elec. Mfrs. v. Gulf Underwriters Ins.*, 162 F.3d 821, 826 (4th Cir.1998) (applying D.C. law) (welders exposed to manganese fumes while using welding products); *Assicurazioni Generali*, 160 F.3d at 1004–06 (applying Maryland law) (carbon monoxide in insured's hotel); *W. Am. Ins. Co. v. Band & Desenberg*, 138 F.3d 1428

(11th Cir.1998) (applying Florida law) (airborne contaminants from attic space into building's office space), *aff'g*, 925 F.Supp. 758 (M.D.Fla.1996); *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir.1997) (applying Pennsylvania law) (carbon monoxide emitted from device used to cure concrete products); *Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co., Inc.*, 112 F.3d 184, 188 (5th Cir.1997) (applying Texas law) (phenol gas at work site); *Am. States Ins. Co. v. Nethery*, 79 F.3d 473 (5th Cir.1996) (applying Mississippi law) (paint and glue fumes resulting from replacement of floor in customer's home); *Vander Hamm v. Allstate Ins. Co.*, 286 F.Supp.2d 790, 794–96 (N.D.Tex.2003) (workers injured by fumes in insured's building caused by contractor who applied chemicals

& n. 1. In contrast, other courts have held that the exclusion does not apply if the facts show that the discharge, dispersal, release or escape was a localized toxic accident occurring within the vicinity of the pollutant's intended use.[6] *Id.* § 127:9

in bathroom near where workers were located); *Hartford Underwriter's Ins. Co. v. Estate of Turks,* 206 F.Supp.2d 968 (E.D.Mo.2002) (inhalation of lead from lead-based paint chips, flakes, or dust); *Longaberger Co. v. U.S. Fid. & Guar. Co.,* 31 F.Supp.2d 595, 603–04 (S.D.Ohio 1998) (tenant's claim that she was injured when insured landlord's furnace emitted carbon monoxide fumes not covered by pollution exclusion because exclusion was unambiguous); *Brown v. Am. Motorists Ins. Co.,* 930 F.Supp. 207, 209 (E.D.Pa.1996) (waterproofing sealant applied to exterior of home); *Essex Ins. Co. v. Tri–Town Corp.,* 863 F.Supp. 38 (D.Mass.1994) (carbon monoxide discharged from Zamboni machine in indoor ice rink); *TerraMatrix, Inc. v. U.S. Fire Ins. Co.,* 939 P.2d 483 (Colo.Ct.App.1997) (ammonia fumes escaping from printing machine); *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.,* 711 So.2d 1135, 1137 n. 2 (Fla.1998) (noting that the majority of courts conclude that the absolute pollution exclusion unambiguously excludes coverage for damages caused by the release of toxic fumes, noting that insurers and amici cited more than 100 cases from 36 other states that had applied the plain language of the exclusion clause to deny coverage); *Truitt Oil & Gas. Co. v. Ranger Ins. Co.,* 231 Ga.App. 89, 498 S.E.2d 572 (1998) (gas leaked onto ground and into sewer system); *Atl. Ave. Assocs. v. Cent. Solutions, Inc.,* 29 Kan.App.2d 169, 24 P.3d 188, 192 (2001) (leak of liquid cement cleaner from 55–gallon drum); *Auto–Owners Ins. Co. v. Hanson ex rel. Demoss,* 588 N.W.2d 777, 781 (Minn.Ct.App.1999) (ingestion and absorption of lead paint on landlord's premises); *Cincinnati Ins. Co. v. Becker Warehouse, Inc.,* 262 Neb. 746, 635 N.W.2d 112, 122 (2001) (discharge does not have to be into environment); *Madison Const. Co.,* 735 A.2d at 109 (sealant fumes); *Sulphuric Acid Trading Co., Inc. v. Greenwich Ins. Co.,* 211 S.W.3d 243 (Tenn.Ct. App.2006) (discharge of sulphuric acid); *Quadrant Corp. v. American States Ins. Co.,* 154 Wash.2d 165, 110 P.3d 733 (2005) (pollution exclusion applies to bar coverage for injury caused by exposure to fumes released from waterproofing sealant); *Cook v. Evanson,* 83 Wash.App. 149, 920 P.2d 1223, 1226 (1996) (sealant applied to exterior of building); *Peace v. Northwestern Nat'l Ins. Co.,* 228

Wis.2d 106, 596 N.W.2d 429, 440 (1999) (lead from flaked paint).

**6.** *See, e.g., Auto–Owners Ins. Co. v. Potter,* 105 Fed.Appx. 484 (4th Cir.2004) (unpublished) (applying North Carolina law) (pollution exclusion does not apply to underlying claims which are "more akin to an instance in which an adulterated product has been supplied to consumers"); *Meridian Mut. Ins. Co. v. Kellman,* 197 F.3d 1178 (6th Cir.1999) (applying Michigan law) (movement of fumes from toxic chemical used by construction contractor to seal floor of school was not "discharge, dispersal, seepage, migration, release or escape" under pollution exclusion when those fumes injured school employee working in room immediately below area where sealer was being applied); *Nautilus Ins. Co. v. Jabar,* 188 F.3d 27, 30–31 (1st Cir.1999) (applying Maine law) (pollution exclusion was ambiguous as applied to claim for injury arising from exposure to fumes discharged by roofing products because reasonable person would understand exclusion as applying only to environmental pollution); *Bituminous Cas. Corp. v. Advanced Adhesive Tech., Inc.,* 73 F.3d 335, 339 (11th Cir.1996) (applying Georgia law) (estate's claim alleging decedent died from inhaling fumes from carpet machine in confined boat cabin space was not excluded from coverage because pollution exclusion was ambiguous and the insurance company's position—"that the clause excludes coverage for a consumer's claim for damages arising out of the intended use of the insured's product—is a strained one."); *Stoney Run Co. v. Prudential–LMI Commercial Ins. Co.,* 47 F.3d 34, 37 (2d Cir. 1995) (applying New York law) (death from carbon monoxide emitted from defective apartment heating system not within exclusion because not pollution of environment); *Red Panther Chem. Co. v. Ins. Co. of Penn.,* 43 F.3d 514, 519 (10th Cir.1994) (applying Oklahoma law) (exclusion ambiguous and did not bar mechanic's claim for injuries resulting from breathing fumes from pesticides which had been spilled by the insured on a car the mechanic was inspecting); *Lumbermens Mut. Cas. v. S–W Indus., Inc.,* 39 F.3d 1324, 1336 (6th Cir.1994) (applying Ohio law) (pollution exclusion did not shield insurer from liability

at 127–28 to 127–29 & n. 2.

## II. *Meridian and Madison—Two Cases Illustrating the Interpretive Split*

No two cases better illustrate the diametrically opposed interpretations of whether a pollution exclusion is ambiguous or unambiguous in the context of a person's exposure to fumes emanating from chemicals used by a party in the ordinary course of that party's business than do *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178 (6th Cir.1999) (applying Michigan law), and *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100 (1999). In *Meridian*, a painting company contracted with the Michigan Board of Education to perform construction work at a high school, including painting and drywall sealing. 197 F.3d at 1180. The plaintiff, a teacher at the high school, alleged that fumes from chemicals the company used to seal a floor in the room immediately above the teacher's classroom caused her various respiratory injuries. *Id.* She filed a personal injury suit against the company in Michigan state court, but the company's insurer denied coverage on the basis of a pollution exclusion clause identical to the one found in the present case. *Id.* In a declaratory action filed in

for "injuries caused by toxic [cements] that are still confined within the area of their intended use."); *Clarendon Am. Ins. Co. v. Bay, Inc.*, 10 F.Supp.2d 736, 744 (S.D.Tex. 1998) (inhalation of fumes from cement product); *Island Assocs., Inc. v. Eric Group, Inc.*, 894 F.Supp. 200, 203 (W.D.Pa.1995) (fumes emanating from product used to remove tile flooring from hospital); *Ctr. for Creative Studies v. Aetna Life and Cas. Co.*, 871 F.Supp. 941, 946 (E.D.Mich.1994) (exposure to fumes of photographic chemical used to develop film in darkroom during photography class); *Regent Ins. Co. v. Holmes*, 835 F.Supp. 579, 582 (D.Kan.1993) (formic acid); *Porterfield v. Audubon Indem. Co.*, 856 So.2d 789, 805 (Ala. 2002) (inhalation of lead); *MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 3 Cal. Rptr.3d 228, 73 P.3d 1205, 1216 (2003) (pesticides applied around apartment building); *Richardson v. Nationwide Mut. Ins. Co.*, 826 A.2d 310, 318 (D.C.2003) (carbon monoxide leaking from furnace in office building), *vacated as moot*, 844 A.2d 344 (D.C.2004); *Kerr–McGee v. Ga. Cas. & Sur. Co.*, 256 Ga. App. 458, 568 S.E.2d 484, 488 (2002) (exposure to chemical fumes wholly inside factory not excluded from coverage because pollution exclusion, "which was designed to apply to the environmental contamination, is so broad that a reasonable insured would not know what would be excluded."); *Am. States Ins. Co. v. Koloms*, 177 Ill.2d 473, 227 Ill.Dec. 149, 687 N.E.2d 72, 81–82 (1997) (holding that pollution exclusion clause did not extend beyond the traditional environmental arena); *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 681 (Ky.Ct.App.1996) (utilization of environmental terms of art ("discharge," "dispersal," "release," etc. of pollutants) reflects the pollution exclusion's avoidance of liability for environmental catastrophe related to industrial pollution); *Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 889 A.2d 387 (2006) (pollution exclusion ambiguous in context of manganese welding fumes and not intended to bar injury caused by "non-environmental, localized workplace fumes"); *W. Am. Ins. Co. v. Tufco Flooring E., Inc.*, 104 N.C.App. 312, 409 S.E.2d 692, 697 (1991) ("To allow [the insurance company] to deny coverage for claims arising out of [the insured's] central business activity would render the policy virtually useless to [the insured]."), *overruled in part on other grounds by, Gaston County Dyeing Machine Co. v. Northfield Ins. Co.*, 351 N.C. 293, 524 S.E.2d 558, 564–65 (2000); *Nav–Its, Inc. v. Selective Ins. Co. of Am.*, 183 N.J. 110, 869 A.2d 929, 934–39 (2005) (policy did not bar coverage for damages resulting from sealant fumes because policy applied to traditional environmentally-related damages); *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 763 N.Y.S.2d 790, 795 N.E.2d 15, 20–21 (2003) (terms "discharge, dispersal, seepage, migration, release or escape" cannot be unambiguously applied to ordinary paint or solvent fumes that drifted a short distance from the area of the insured's intended use and allegedly caused inhalation injuries to a bystander); *A–1 Sandblasting & Steamcleaning Co., Inc. v. Baiden*, 53 Or.App. 890, 632 P.2d 1377, 1380 (1981) (spray paint).

federal court, the district judge held that the insurer was obligated to defend and indemnify the company in the teacher's state court action. *Id.*

On appeal, both the company and its insurer conceded that the sealer that caused the teacher's injuries was a pollutant. *Id.* The sole issue on appeal, therefore, was "whether the movement of fumes from a toxic chemical used to seal a floor in the course of an insured's business constitutes a 'discharge, dispersal, seepage, migration, release or escape' [of pollutants] within the terms of an insurance policy's total pollution exclusion, when those fumes injure an employee" while that employee is working in a room on the floor immediately below the area where the sealer was applied. *Id.* at 1181, 1183. After noting the "disarray that characterized this area of [the] law," *id.* at 1183, the Sixth Circuit held that the total pollution exclusion did not bar coverage for the teacher's injuries, concluding that "no reasonable person could find that the insurance policy at issue unambiguously excluded coverage for injuries suffered by an employee who was legitimately in the immediate vicinity of the chemicals, and where the injury occurred only a few feet from where the chemicals were being used." *Id.* At best, the policy was "ambiguous as to whether it covered injuries caused by toxic chemicals in the immediate area of their intended use." *Id.*

In *Madison,* however, the Supreme Court of Pennsylvania reached the opposite conclusion. There, the insured was engaged in pouring and curing concrete utility trenches at a Boeing helicopter facility. *Madison,* 735 A.2d at 102. To cure the concrete, the insured applied a coating to the floor of the facility. To capture and prevent the sealant fumes from escaping

into the Boeing building, the insured enclosed the construction site in a polyethelene bubble, also known as a "construction envelope." Even with this construction envelope, the strong odor produced by the floor sealant permeated the Boeing building. A Boeing employee was summoned to the construction area to set up a fan inside the construction envelope to increase ventilation and reduce the odor in the building. But as the employee attempted to set up an exhaust fan, he was overcome by the fumes, lost consciousness, and fell into an excavation site and injured himself. *Id.* The employee filed a negligence action against the floor coating company. The company's insurer denied coverage based on a pollution exclusion clause contained in the insurance policy between the two parties.[7] *Id.* The trial court granted summary judgment in favor of the construction company, but the intermediate appellate court, sitting *en banc,* reversed and found that the pollution exclusion clearly and unambiguously applied to relieve the insurer of its obligation to defend the insured company. *Id.* at 103–05.

The Supreme Court of Pennsylvania affirmed the intermediate appellate court. Relying heavily on the Material Safety Data Report prepared for the sealant, the court first concluded that the policy's definition of "pollutant," which is the same definition contained in the Policy in this case, unambiguously applied to the floor sealant because of the sealant's harmful chemical properties. *Id.* at 107. Next, the court held that the exclusion's requirement of an "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants" was similarly unambiguous because, *inter alia,* the policy at issue did not expressly require that

---

7. The pollution exclusion in *Madison* was virtually identical to that contained in *City of* *Chesapeake, supra.*

such discharges or dispersals be "into the environment." *Id.* at 108–09.

As both *Meridian* and *Madison* make clear, two contrary philosophies exist concerning the interpretation of "total" or "absolute" pollution exclusions. The first school of thought holds that the exclusion does not apply where the pollution in question is not environmental or industrial in nature, whereas the other concludes that the exclusion is indeed absolute and applies to any set of facts that come within the literal meaning of its terms. As more fully set forth below, this Court concludes, albeit reluctantly, that Virginia insurance and contract law would lead the Supreme Court of Virginia to conclude that the Total Pollution Exclusion clause at issue here is unambiguous as applied to the pertinent factual allegations.

### III. Virginia Law Provides the Answer

■ The Supreme Court of Virginia did not expressly limit its holding in *City of Chesapeake* to cases involving "traditional" environmental pollution, and there is no reason to believe that it would do so if presented with the facts of the instant case.[8] The Court explicitly refused to look to the holdings of courts in other jurisdictions which had interpreted similar pollution exclusion · provisions. Rather, the Court simply applied the facts of the case to the language presented in the policy's pollution exclusion clause, and analyzed the results under well-established Virginia contract law. *See City of Chesapeake,* 628 S.E.2d at 542. Here, the insureds argue that the words "discharge, dispersal, seepage, migration, release or escape" are environmental terms of art which should apply

only to discharges of pollutants into the environment. (R.J. Smith's Mem. at 7) (citing cases). At the same time, the insureds contend that the Pollution Exclusion clause is not applicable because the facts of this case do not evince a traditional pollution scenario.

The argument belies Virginia's settled principles of contract interpretation. Nowhere in the Policy is there any reference to the word "environment," "environmental," "industrial," or any other limiting language suggesting the pollution exclusion is not equally applicable to both "traditional" and indoor pollution scenarios. The Pollution Exclusion clause does not say the discharges or dispersals of pollutants must be "into the environment" or "into the atmosphere," or in any way indicate that environmental "incidents" are the only conditions that bar coverage under the clause. On the contrary, considering the exclusion language in its entirety, it broadly applies to "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of...any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste...at any time." (The Policy at FIC000056, FIC000059.) The Pollution Exclusion is quite specific. To hold in favor of the Defendants would require this Court to interject words into the writing contrary to the elemental rule that the function of the court is to construe the contract made by the parties, and not to reformulate a contract for them. *See Cave Hill Corp. v. Hiers,* 264 Va. 640, 570 S.E.2d 790, 793 (2002) (refusing to impose requirement on employer that employee

---

**8.** The Court contemplated certifying the precise issue to the Supreme Court of Virginia, *see* Va. Const. art. VI, § 1; Va. Sup.Ct. R. 5:42(a), but where the applicable statute of limitations for Lewis to formally pursue her claim is due to expire in the near future (April 2007), the Court deemed 'it inappropriate to suggest that any defending party agree to a tolling of the applicable statute of limitations as would be undoubtedly necessary to allow enough time for the Supreme Court to consider and respond to the issue.

could only be terminated for "just cause" because writing did not contain any reference to a "just cause" requirement) (citation omitted). Indeed, Virginia courts have repeatedly .refused to employ words not expressed in the parties' original contract, instead construing contracts as written without adding terms that were not included by the parties. *See, e.g., Lansdowne Dev. Co., L.L.C. v. Xerox Realty Corp.*, 257 Va. 392, 514 S.E.2d 157, 161 (1999) ("[W]e will not insert by construction, for the benefit of a party, a term not express in the contract.") (citation omitted); *Plaskitt v. Black Diamond Trailer Co.*, 209 Va. 460, 164 S.E.2d 645, 650–51 (1968) (court will not insert provisions omitted by the parties and, therefore, service contract with no fixed period deemed contract terminable at will).

Nothing in the language of the Policy or the Pollution Exclusion clause at issue suggests that the parties intended only "traditional" or "outdoor" pollution scenarios to be excluded from coverage, and it would be impermissible for the Court to construe the clause as creating an ambiguity where none exists. The drafters of the clause could have used words of limitation to exempt indoor (*i.e.*, non-industrial) air pollution from its application, but they did not do so. The broadness of the exclusionary language, coupled with the parties' failure to specify that the exclusion be limited to only "traditional" or "industrial" pollution, therefore mandates the conclusion that the Pollution Exclusion clause is sweeping, excepting *both* environmental and indoor pollution occurrences from coverage.

Other provisions in the Policy support this conclusion. For example, the Hostile Fire Exception to the Pollution Exclusion clause signifies that the Pollution Exclusion applies to indoor pollution. The Hostile Fire Exception provides that the pollution exclusion proviso does not apply to claims for bodily injury or property damage arising out of "heat, smoke or fumes from a 'hostile fire,'" *i.e.*, a fire that "becomes uncontrollable or breaks out from *where it was intended to be.*" (The Policy at FIC000055 (defining "hostile fire"), FIC000059 (delineating the hostile fire exception) (emphasis added.)) The Hostile Fire Exception therefore ensures that the pollution exclusion does not eliminate coverage for outbreaks of fire on the premises by excluding coverage for damage resulting from smoke and fume inhalation, smoke damage, and other claims, whether such damage occurs on or off the premises. The Hostile Fire Exception "clearly applies to accidents that occur within a building and that do not result from what is commonly considered industrial environmental pollution." *Assicurazioni Generali*, 160 F.3d at 1000. The Hostile Fire Exception would be unnecessary if the Pollution Exclusion clause were limited to traditional environmental pollution scenarios, because the usual fires (and smoke and fumes generated) in an industrial or indoor setting do not qualify as a "traditional" environmental occurrence.

Likewise, the Pollution Exclusion clause contains a Building Heating Equipment Exception that makes the Pollution Exclusion clause inapplicable to bodily injury "if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot from equipment used to heat that building." (The Policy at FIC000059.) As Firemen's notes, "[i]f the Total Pollution Exclusion were limited to atmospheric or outdoor pollution" only, "the Building Heating Exception would be rendered meaningless[.]" (Firemen's Resp. at 3) (docket entry no. 20.) Together, the Hostile Fire Exception clause and Building Heating Equipment Exception proviso signify that the Total Pollution Exclusion clause was intended to apply to all forms

of pollution damage, whether it be traditional pollution or pollution resulting from an incident that occurred during intended use.

R.J. Smith and Kline further argue that if the pollution exclusion here is held to be unambiguous, the Policy would apply to defeat their reasonable expectations and render the Policy virtually meaningless. In other words, the insureds suggest that, in procuring the Policy from Firemen's, they reasonably expected that the pollution exclusion would not operate to bar coverage for bodily injury resulting from the sealant's application in the normal course of the insureds' business. (R.J. Smith's Mem. at 5–6; R.J. Smith's Resp. at 2; Kline's Br. at 7–8.) The argument fails for two reasons. First, Virginia has never explicitly adopted the "reasonable expectations" doctrine by which an insured's expectations as to the scope of coverage must be upheld, provided that such expectations are objectively reasonable. *See Norfolk & W. Ry. v. Accident and Cas. Ins. Co.*, 796 F.Supp. 929, 933 (W.D.Va.1992). However, even if this Court were to find the doctrine applicable in this case, it would only be relevant to this Court's analysis so as to give meaning to *ambiguous* Policy provisions. *See Appleman on Insurance 2d, supra*, § 7.2 (*"Where the court finds the exclusion to be ambiguous*, it may resort to the doctrine of reasonable expectations as the basis for analysis and resolution of the dispute.") (emphasis added). Having concluded that the subject Policy is *unambiguous*, the Court is not at liberty to speculate as to the Defendants' reasonable expectations in procuring the Policy from Firemen's, for the parties' intent is manifest in the express language of the Policy itself.

Because the words "discharge," "dispersal," "seepage," "migration," "release," or "escape" are not defined in the Policy, they must be given their usual, common, and ordinary meaning. *D.C. McClain, Inc. v. Arlington County*, 249 Va. 131, 452 S.E.2d 659, 662 (1995) (citation omitted). To "discharge" is to, *inter alia*, "pour forth; emit," or "to release, send away, or allow to go (often fol. by *from* )," *Webster's New Universal Unabridged Dictionary* 561 (2003), or to "allow (a liquid, gas, or other substance) to flow out from where it has been confined," *The New Oxford American Dictionary* 482 (2d ed. Oxford Univ. Press 2005). "Dispersal" is "to cause (particles) to separate uniformly throughout a sold, liquid, or gas," *Webster's, supra*, at 568, or "the action or process of distributing things . . . over a wide area," *Oxford, supra*, at 488. "Seepage" is "the process of seeping," that is "the slow escape of a liquid or gas through porous material or small holes." *Oxford, supra*, at 1534. "Migration" is to "move from one specific part of something to another." *Id.* at 1074. To "release" is "to free from confinement, bondage, obligation, pain, etc.; to let go." *Webster's, supra*, at 1627. And "escape" has been defined as, among other things, "leakage, as of water or gas." *Id.* at 660; *see also Oxford, supra*, at 574 (defining "escape" as "(of a gas, liquid, or heat) leak from a container").

"Common to all of these terms is, obviously, the element of movement. The listing of similar terms such as 'discharge' and 'dispersal,' preceded by the phrase 'actual, alleged, or threatened,' indicates an intent to comprehend all such types and degrees of movement." *Madison*, 735 A.2d at 108. When thus read, the Pollution Exclusion clause applies to the incident at issue. A pollutant, the epoxy floor sealant, was applied to the surface of the warehouse floor, and it dispersed into the air above and around the warehouse floor, eventually reaching Lewis' office where she later inhaled the toxic fumes. The Pollution Exclusion clause applies unambiguously to Lewis' allegations, and thus

Firemen's owes no duty to defend or indemnify its insureds should Lewis formally pursue her personal injury claim.

### Conclusion

The Court's interpretation of the Policy language has resulted in the preclusion of coverage for an insured that purchased insurance coverage with, in all likelihood, the expectation that the Policy would provide coverage for injuries caused by toxic substances used in conformity with their intended purpose. It can also be fairly argued that the Pollution Exclusion clause is inherently ambiguous given the "disarray" in numerous court decisions that has characterized this particular area of insurance law for over two decades. *Meridian,* 197 F.3d at 1183; *Nationwide Mut. Ins. Co. v. Richardson,* 270 F.3d 948, 956 (D.C.Cir.2001) (certifying pollution exclusion issue to the District of Columbia Court of Appeals because "[w]ith so many courts coming to diametrically opposed conclusions about the clause's clarity and meaning, it is difficult to know which line of cases the [District's highest court] would follow."). But under Virginia law, an insurance policy is not ambiguous merely because courts of varying jurisdictions differ with respect to the construction of policy language. *See Nationwide Mut. Ins. Co. v. Wenger,* 222 Va. 263, 278 S.E.2d 874, 877 (1981). Such an ambiguity, if one exists, must be found on the face of the policy, *id.,* and since the Court finds no such ambiguity exists in the policy language in this case, the Pollution Exclusion clause operates to bar coverage of Lewis' claim.

Although the Court may well have been persuaded by what it views to be the more common sense analysis in such case precedent as *Meridian, supra,* whereby the exclusion would logically relate only to unexpected/unintended discharges, releases, etc., of pollutants into the environment as opposed to those occurring in the normal course of business, the Court is required to follow what it deems to be the directive of the Supreme Court of Virginia in *City of Chesapeake,* as well as the absence of any endorsement in Virginia law of the "reasonable expectations" doctrine. Perhaps the Commonwealth's highest Court will have the opportunity to revisit the issue in the clear context of a "non-traditional" (*i.e.,* non-environmental or non-industrial) pollution occurrence, reaching a different conclusion than this Court has predicted. Until then, or until otherwise directed by the Fourth Circuit Court of Appeals, this Court is constrained to deny coverage.

Accordingly, for the reasons stated, Firemen's Motion for Partial Summary Judgment must be GRANTED and the insureds' cross motions DENIED.

An appropriate Order shall issue.