# CIRCUIT COURT OF THE CITY OF RICHMOND

PBM Nutritionals, L.L.C.

v.

Lexington Ins. Co.,
Arch Ins. Co.,
and Ace American Ins. Co.

January 7, 2011

Case No. CL09-5289

BY JUDGE WALTER W. STOUT, III

On October 28, 29, and 30, 2010, the Court heard the evidence and arguments of each party. For the reasons set forth below, the Court finds no insurance coverage for the Plaintiff's losses sustained from the contamination of its infant formula.

## I. *Facts and Procedural History*

PBM Nutritionals, L.L.C. ("PBM") manufactures and produces infant formula at a facility located in Burlington, Vermont. At issue in this suit is the loss of approximately $6 million worth of infant formula that was rendered unsalable due to the presence of melamine and disintegrated filter components in the formula.

To manufacture its infant formula, PBM uses filtered water heated at 140 to 160 degrees Fahrenheit in order to bind nutrients, vitamins, amino acids, and other FDA-approved ingredients to a milk, soy, or other base. To heat this water to the requisite temperature, PBM uses a heat exchanger, which is a tank containing two tubes: a steam tube and a water tube. The water tube contains the water that eventually mixes with the dry ingredients to form the infant formula. The steam tube is controlled in part by a "butterfly valve," which can be opened or closed to allow steam to enter the steam tube as necessary. When steam is released into the steam tube, the steam

tube becomes heated, which heats the air in the heat exchanger surrounding both tubes. As the air becomes hot, the water tube is heated, which in turn heats the water inside the water tube. Before the water is released from the heat exchanger into the liquefying tank where it mixes the dry ingredients, the water passes through FDA-approved water filters to ensure that it is clean. Industrial dryers then dry the created mixture into the finished infant formula.

On December 14, 2008, during a routine cleaning, PBM personnel discovered that the butterfly valve allowed steam to leak into the steam tube when the valve was in the closed position. PBM had been using this butterfly valve for the past five years. PBM ordered a replacement valve, but it did not arrive until late January 2009. Despite the leaky butterfly valve, PBM continued to manufacture infant formula and conduct routine cleanings until January 20, 2009. PBM's testing detected no increase in the melamine levels in the infant formula produced during this period.

Starting on January 20 through January 22, 2009, PBM conducted an extensive cleaning of the system in preparation for the manufacture of its Profylac brand infant formula. A routine cleaning usually takes about four to six hours, but a "Profylac cleaning" takes between forty-two to forty-six hours. During the "Profylac cleaning," water was sealed inside the heat exchanger water tube and in the filter housing. Because the butterfly valve was leaking, steam seeped into the heat exchanger and heated the water in the water tube and the filter housing. This superheated the water to exceed the ambient boiling point of water. Experts estimate that the temperature of the water exceeded 220 degrees and remained that high for many hours. Unable to withstand the superheated water, the water filters disintegrated into their constituent components of cellulose, melamine, and other filter materials.

After completing the two-day "Profylac cleaning," PBM began to manufacture Profylac formula, unaware that it was using the superheated water that contained melamine and other filter materials. When PBM tested the batches of Profylac, it discovered that four of the twenty five batches contained levels of melamine that were above the FDA limit of one part per million ("ppm"). The other twenty-one batches had melamine levels that were within the FDA limit but were thought by PBM to contain filter components. Nevertheless, after proper notice to the insurance companies, PBM ultimately elected to destroy all batches manufactured after the "Profylac cleaning."

At the time of the loss, PBM had four insurance policies, all of which PBM argues provides coverage for its loss. Specifically, PBM had property damage and business interruption insurance policies with Lexington Insurance Co. ("Lexington"), ACE American Insurance Co. ("ACE"), and Arch Insurance Co. ("Arch"). ACE afforded coverage for 50% of any covered loss, while Arch and Lexington each afforded coverage

for 25%. PBM also had a contamination insurance policy with Dornoch, Ltd. ("Dornoch"). PBM settled its claim with Dornoch for $2 million, and Dornoch was dismissed from this suit. PBM proceeded against the other three insurance companies, alleging that the policies provided coverage for PBM's loss and that the remaining insurance companies acted in bad faith when they denied PBM's claim.

In the interests of justice and judicial economy, the Court agreed to bifurcate PBM's claims into two separate trials: the first to determine whether coverage exists and the second to determine the issue of bad faith, if necessary. Accordingly, the two and one-half day trial before the Court on October 28-30, 2010, dealt only with the issue of coverage.

## II. *Coverage Under the Pollution/Contamination Exclusions*

### A. *Relevant Provisions*

The Defendants concede that the insurance policies they entered into with PBM largely mirror each other. All three policies contain a manuscript policy with numbered endorsements attached. Each manuscript policy contains Paragraph 8 "Perils Insured Against," which describes the coverage as an "all risk" policy stating, "This policy insures against all risks of physical loss of or damage to property described herein, including general average, salvage, and all other charges on shipments covered hereunder, except as hereinafter excluded." Immediately following is Paragraph 9 "Perils Excluded," which includes Paragraph 9(H) "Pollution." This provision states, in pertinent part:

> 9. This policy does not insure. . . .
> H. Pollution. The Insurers will not cover loss or damage solely and directly caused by or resulting from the presence, release, discharge, or dispersal of "pollutants" unless the presence, release, discharge, or dispersal is itself caused by a peril insured against.
> *Definition*: Wherever in this policy the word *pollutant(s)* occurs, it shall be held to mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste.

PBM contends that under these "all risk" policies, which cover physical losses to covered personal property, its water filters comprise insured personal property that underwent physical damage. Consequently, the contamination resulting from the loss of the filters qualifies as an exception to the Paragraph 9(H) exclusion because the damaged filters are

a "peril insured against." Therefore, PBM seeks insurance coverage of its losses sustained from the contamination under these provisions.

The Defendants, however, assert that certain endorsements, attached to the manuscript policies, control so as to exclude such coverage. All three insurance policies each contain an endorsement related to pollution and contamination: ACE's "Contamination and/or Seepage and/or Pollution Exclusion," Arch's "Pollution & Contamination Exclusion Endorsement," and Lexington's "Pollution, Contamination, Debris Removal Exclusion Endorsement." The Defendants concede all three endorsements are substantially the same with only slight variation in title and form. From ACE's policy, this endorsement reads:

> This Policy does not insure against loss or damage caused by or resulting from any of the following causes of loss regardless of any other cause or event contributing concurrently or in any other sequence to the loss:
>
> Loss or damage caused by, resulting from, contributed to, or made worse by actual, alleged, or threatened release, discharge, escape, or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote, or in whole or in part caused by, contributed to, or aggravated by any physical damage insured in this Policy.
>
> This exclusion shall not apply if seepage or contamination or pollution arises from direct physical loss or damage to insured property from Fire, Lightning, Explosion, Windstorm, Hail, Smoke, Aircraft or Vehicle Impact, or Leakage from Fire Protection Equipment.
>
> Contaminants or pollutants mean any material which after its release can cause or threaten damage to human health or human welfare or cause or threaten damage, deterioration, loss of value, marketability, or loss of use to property insured hereunder, including, but not limited to, bacteria, fungi, virus, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the U.S. Environmental Protection Agency.

Under this endorsement, the Defendants contend all losses derived from contaminants or pollutants are excluded from coverage unless the loss was caused by one of the listed exceptions of "Fire, Lightning, Explosion," etc. As Defendants point out, this list does not include the exception for "insured perils" contained in Paragraph 9(H).

Additionally, the policies of Arch and Ace have endorsements related to product contamination and product recall. These endorsements are similar, stating in relevant part:

> This policy does not insure against any cost associated with any form of contamination of the Insured's raw stock, stock in process or finished stock, or products in the stream of commerce, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to, or aggravated by any physical damage insured in this policy except as provided under the contamination &/or seepage &/ or pollution exclusion.

Ace and Arch attempt to exclude the contamination of the infant formula under these endorsements as well.

## B. *Legal Standard*

Virginia law applies to this coverage dispute because the insurance policies were delivered to PBM in Gordonsville, Virginia. *See Buchanan v. Doe*, 246 Va. 67, 70-71, 431 S.E.2d 289, 291 (1993) (citations omitted). Under Virginia law, the courts must apply to insurance contracts the same rules of construction generally applied to contracts. E.g., *Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993); *Harleysville Mut. Ins. Co. v. Dollins*, 201 Va. 73, 77, 109 S.E.2d 405 (1959). The court should identify the plain meaning of the contract provisions to determine the parties' intent as expressed by the words chosen by them in the instrument. *E.g., Graphic Arts Mut. Ins. Co. v. C. W. Warthen Co.*, 240 Va. 457, 460, 397 S.E.2d 876, 878 (1990); *Firemen's Ins. Co. of Washington, D.C. v. Kline & Son Cement Repair, Inc.*, 474 F. Supp. 2d 779, 788-89 (E.D. Va. 2007). To give effect to the intention of the parties as expressed in the instrument, the court should construe the contract as a whole so as to reasonably harmonize any seemingly conflicting provisions. *Transcontinental Ins. Co. v. RBMW*, 262 Va. 502, 512, 551 S.E.2d 313 (2001) (citing *Suggs v. Life Ins. Co. of Va.*, 207 Va. 7, 11, 147 S.E.2d 707, 710 (1996)). It is also well settled in Virginia that, where two constructions of an insurance contract are equally possible so as to create an ambiguity, that most favorable to the insured will be adopted. *Virginia Farm Bureau Mut. Ins. Co. v. Williams*, 278 Va. 75, 81, 677 S.E.2d 299, 302 (2009); *St. Paul Fire & Marine Ins. Co. v. Nusbaum & Co.*, 227 Va. 407, 411, 316 S.E.2d 734, 736 (1984).

## C. *Analysis*

### 1. *Paragraph 9(H)*

PBM argues that the policies "create coverage" for the contamination through Paragraph 9(H), since the water filters are covered personal property falling under the exception to this exclusionary paragraph. However, at trial, PBM conceded that, even if these damaged filters comprised an insured peril, Paragraph 9(H) does not automatically "create coverage" for the contamination stemming therefrom but rather prevents the Defendants from excluding coverage for the contamination as a "pollutant." Indeed, an "exclusion . . . does not grant coverage. To the contrary it is a limitation or restriction on the insuring clause." *Nationwide Mut. Ins. Co. v. Wenger*, 222 Va. 263, 267, 278 S.E.2d 874, 876 (1981) (quoting *Haugan v. Home Indem. Co.*, 86 S.D. 406, 413, 197 N.W.2d 18, 20 (1972)).

ACE and Arch do not deny coverage for the water filters as personal property under their respective policies. Rather, they dispute PBM's contention that Paragraph 9(H) provides coverage for the contamination loss because the attached pollution and contamination endorsement operates to modify and/or supersede Paragraph 9(H). Unlike Ace and Arch, Lexington disputes the coverage of the water filters as covered personal property under its policy, but it makes the same argument as ACE and Arch with regards to the effect of the pollution and contamination endorsement on Paragraph 9(H). Ultimately, whether 9(H) provides coverage is moot in light of the Court's opinion about the effect of the Pollution and Contamination endorsement on Paragraph 9(H).

### 2. *Pollution and Contamination Endorsements*

PBM contends that the pollution and contamination endorsement conflicts with Paragraph 9(H) so as to create an ambiguity that must be construed in favor of the insured. In support of its position, PBM cites a Florida case where the court gave no effect to an endorsement that contradicted the underlying policy instead of holding that the endorsement superseded the policy. *Indiana Ins. Co. v. Miguelarcaina*, 648 So. 2d 821, 822 (Fla. Dist. Ct. App. 1995). However, the *Miguelarcaina* case is not instructive for the present case. The *Miguelarcaina* court gave no effect to the endorsement because it held that the endorsement, though attached to the policy at issue, operated to modify an entirely different policy. *Id.* Moreover, the court found that the insured was on notice of this fact because the endorsement, unlike other endorsements attached to the policy, referred to a different policy title and dealt with matters superfluous to the type of insurance purchased. *Id.* In the case at bar, there is no dispute about whether

the pollution and contamination endorsements operate on the attached manuscript policy versus another policy.

Further, the Court is persuaded by the rule articulated in the treatise *Couch on Insurance* that "when a rider or endorsement modifies, qualifies, or restricts the terms of the original policy, the rider or endorsement controls." § 21:22 (3d ed. 2010); *see also* 3-21 *Appleman on Insurance Law and Practice* §§ 1.07(8), 21.02(2)(a) (2d ed. 2010). Such a rule reflects the common practice of insurance contracts containing standard policy forms, which are then tailored by the attachment of endorsements to meet the needs of the contracting parties. To hold otherwise would render all endorsements to insurance contracts ineffective. In other words, an all-risk policy is defined by its exclusions.

In this case, Paragraph 9(H) of the manuscript limits coverage for losses arising from pollutants except when the introduction of those pollutants is caused by an insured peril. However, the pollution and contamination endorsement modifies the manuscript policy to expand the exclusion of pollution and contamination, but without the exception contained in Paragraph 9(H). By its very terms, the contract acknowledges that the manuscript policy provides insurance "except as hereinafter excluded" in Paragraph 8 of the manuscript. Therefore, these endorsements have the effect of superseding Paragraph 9(H) to the extent that they conflict. PBM's argument that the conflict in meaning between the endorsements and Paragraph 9(H) presents an ambiguity, therefore, fails. The Court further finds the endorsement itself to be clear and unambiguous, despite PBM's insistence to the contrary. Accordingly, the Court need not construe these provisions to favor the insured nor must it consider the expectations of the parties as explained by trial testimony of the underwriters.

PBM attacks the validity of these endorsements on the basis that they are overly broad and cannot be upheld without defeating the intent of the parties because the definition of "contaminant" and "pollutant" contained in the endorsement is unlimited. However, a plain reading of these definitions shows that limitations are in place to restrict what can qualify for exclusion from coverage. Each endorsement contains a list of exceptions including losses or damages directly caused by "fire, lightning, aircraft impact, explosion, riot, civil commotion, smoke, vehicle impact, windstorm, hail, vandalism, malicious mischief, or accidental discharge from automatic fire protective systems." Moreover, the contamination must harm the product or cause the product to lose its marketability. Other jurisdictions have upheld similar endorsements as clear and unambiguous. *E.g., Miller v. Harleysville Mut. Cas. Co.*, 37 F. Supp. 983, 984-85 (E.D. Va. 1941) (where an endorsement, by its terms, plainly eliminated the standard omnibus coverage provisions of the printed insurance policy, the federal court gave the endorsements its superseding effect). Therefore, the endorsement is not overly broad as PBM suggests.

### 3. *Environmental Pollution*

PBM further argues the pollution and contamination endorsements are limited only to losses stemming from "traditional environmental pollution." PBM supports its position by citing two reported circuit court opinions, *Unisun Ins. Co. v. Schulwolf*, 53 Va. Cir. 220 (City of Norfolk 2000), and *Marshall v. Selective Ins. Co. of Am.*, 46 Va. Cir. 502, 508 (City of Norfolk 1995). However, these cases can be distinguished from the case at bar.

In *Unisun*, PBM incorrectly identifies the holding of the case by suggesting the court concluded the exclusionary clause applied only to claims based on environmental pollution. In fact, the court simply asserted that this interpretation was just as reasonably plausible as the opposite construction that the exclusionary clause was not so limited. *Unisun*, 53 Va. Cir. at 224. Consequently, the court found the clause to be ambiguous and construed the contract to permit coverage for the insured. 53 Va. Cir. at 225. In *Marshall*, the endorsement at issue was upheld as applicable to "environmental pollution," but the endorsement contained not only a definition of "pollutant" similar to the case at bar but also a definition of "pollution hazard" describing the "release or escape of such 'pollutants' into or upon the land, the atmosphere, or any water course or body of water." *Marshall*, 46 Va. Cir. at 503.

No such language exists in the policies in this case. The Lexington and Arch policies make reference to various environmental acts such as the Federal Water Pollution Control Act and the Clean Air Act. These references, however, under a plain reading, are part of a non-exhaustive exemplary list of hazardous substances that may amount to a contaminant or a pollutant, whereas the *Marshall* endorsement defined its exclusions according to those stemming from "pollution hazards" that were "environmental" by definition. Further, these policies specifically do not insure against damage to land or water, which is the natural definition of "environmental pollution."

The Defendants more persuasively focus on *Firemen's Ins. Co. v. Kline & Son Cement Repair*, in which the Eastern District of Virginia noted "[t]he Supreme Court of Virginia did not expressly limit [the application of the pollution exclusion] . . . to cases involving 'traditional' environmental pollution, and there is no reason to believe that it would do so. . . ." 474 F. Supp. 2d 779, 796 (E.D. Va. 2007) (citing *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.*, 271 Va. 574, 579, 628 S.E.2d 539, 542 (2006)). This recent case points out how the Supreme Court refrained from interpreting the insurance contract pollution exclusions as limited to "traditional pollution," and rather employed traditional rules of construction.

Applying a similar analysis, the endorsements in the case at bar are not limited to only "environmental" pollution. In fact, the term "environmental" is absent along with any language that would suggest the discharges or dispersals of pollutants must be into the environment or atmosphere. The endorsement, on its face, is broad, but not unlimited, to include both outdoor and indoor pollution. PBM's interpretation of the endorsement as limited to "environmental pollution" is simply unreasonable in light of a plain reading of the contract.

The parties' post-trial briefs clearly show a split of opinion on this matter among different jurisdictions around the country; however, this, in and of itself, does not create an ambiguity warranting construction in favor of the insured. *Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993). Consequently, the endorsement unambiguously includes as a contaminant or pollutant, the melamine and filter material that caused a loss of marketability to the infant formula.

### 4. *Product Recall Endorsements*

With respect to Ace and Arch's additional endorsements for product recall and contamination, PBM suggests these exclusions apply only to infant formula that enters the stream of commerce. This interpretation flies in the face of a plain reading of these endorsements, which clearly apply to contamination of PBM's "raw stock, stock in process or finished stock" and not just to "products in the stream of commerce." The term "stream of commerce" does not serve as a condition to all items listed, but rather applies to the immediately preceding item, "product." *See Virginia v. Browner*, 80 F.3d 869, 877 (4th Cir. 1996) (applying the "last antecedent" rule of grammatical construction because the modifying clause applies only to the item immediately preceding it where no serial comma is used in the series).

Therefore, under these endorsements, the contamination of the infant formula, even in its "raw" form, prior to entering the stream of commerce, is excluded from coverage.

### III. *Lexington's Equipment Breakdown Coverage*

### A. *Facts*

PBM further argues that coverage for its loss is provided for under the Lexington policy's Equipment Breakdown Coverage Endorsement. Unlike the so-called "all risk" policies at issue in Part II above where coverage is very broad with specific perils excluded, the equipment breakdown coverage endorsement provides coverage on a named perils basis. Specifically with regards to Lexington's policy, this means that for

a loss to be covered under this endorsement, the loss must result from an "accident" to "covered equipment."

The Lexington policy's Equipment Breakdown Coverage Endorsement states in pertinent part as follows:

1. Coverage

This Equipment Breakdown Coverage provides insurance for a Covered Cause of Loss as defined in A.1. below. In the event of a Covered Cause of Loss, we will pay for loss as described in A.2. below.

1. Covered Cause of Loss — "Accident"

The Covered Cause of Loss for this Equipment Breakdown Coverage is an "accident." Without an "accident," there is no Equipment Breakdown Coverage.

a. "Accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following. . . .

(5) An event inside hot water boilers or other water heating equipment that damages such equipment; or. . . .
"Accident" does net include any condition listed in Definition G.1.b.

b . . . "Covered Equipment" does not include any property listed in Definition G.8.b. . . .

G. Definitions

1. "Accident". . . .

c. "Accident is defined in A.1.a.

d. None of the following is an "accident," however caused and without regard to whether such condition or event is normal and expected or unusual and unexpected:

(1) Depletion, deterioration, rust, corrosion, erosion, settling, or wear and tear,

(2) Any gradually developing condition. . . .

8. "Covered Equipment"

a. "Covered Equipment" is defined in A.1.b.

b. None of the following is "covered equipment". . . .

(8) Water piping that is not part of a closed loop used to conduct heat or cooling from a boiler or a refrigeration or air conditioning system. . . .

B. *Legal Standard*

Under Virginia law, the burden falls on the policyholder to bring itself within the coverage of the insurance policy. *See Maryland Cas. Co. v. Cole*, 156 Va. 707, 716, 158 S.E. 873 (1931). As stated earlier, since an insurance

policy is a contract, in construing a policy, the Court should give the words "their ordinary and customary meaning when they are susceptible of such construction," as is the case with any other contract, *Hill v. State Farm Mut. Auto. Ins. Co.*, 237 Va. 148, 152, 375 S.E.2d 727, 729 (1989), and the Court should consider the policy "as a whole," construing the policy "according to [its] terms and provisions." *Id.* at 153, 375 S.E.2d at 730.

## C. *Analysis*

The first requirement for coverage under the Equipment Breakdown Coverage Endorsement is that a "Covered Cause of Loss" must occur, i.e. an "accident," defined as a "fortuitous event," must occur. PBM contends that its loss was an "accident," a "fortuitous event," resulting from the sudden mechanical breakdown of the water filters into their constituent components caused by the superheated water.

However, PBM's argument noticeably ignores the leaking butterfly valve that allowed steam to leak into the heat exchanger where the water was stored. The evidence and testimony at trial revealed that the butterfly valve leaked due to wear and tear and that this defect was a gradually developing condition. There was no evidence that the valve had broken, cracked, or sustained any physical damage other than normal wear and tear at the valve seat and seal. At the time of the loss, PBM had been using the butterfly valve for at least five years and was aware of its defective condition for at least one month before the water filters disintegrated. Yet, despite its awareness that the valve allowed steam to leak into the steam tube of the heat exchanger, even when in the "off" position, and despite its knowledge that a replacement valve was not yet available, PBM continued to use the valve to manufacture its infant formula. More importantly, PBM decided to conduct the forty-two to forty-six hour long "Profylac cleaning" with water sealed in the heat exchanger.

The Court finds that PBM's exclusive focus on the disintegration of the water filters as the cause of the incident is misplaced. Rather, the Court is persuaded that the leaking butterfly valve was the cause of the incident. But for the leaking valve allowing steam to seep into the heat exchanger when it should not have, the entire incident would have been avoided.

Parts G.d(1) and d(2) of the Equipment Breakdown Coverage Endorsement specifically exclude "wear and tear" and a "gradually developing condition" from the definition of an "accident" no matter how the condition is caused and "without regard to whether such condition or event is normal and expected or unusual and unexpected." As such, the Court does not consider the leakage of the valve and the resulting damage it caused a "fortuitous event" within the meaning of the Lexington policy.

The Court, accordingly, finds that there is no coverage for PBM's loss under the Equipment Breakdown Coverage Endorsement of the Lexington policy.

## IV. *Conclusion*

For the foregoing reasons, the Court denies the Defendants' motion to strike Plaintiff's evidence and their renewed motions to strike. The Court also denies Plaintiff's motion to strike Defendants' evidence.

The Court finds that the coverage inconsistencies between Paragraph 9(H) and the pollution and contamination endorsements do not create an ambiguity. Rather, the endorsements operate to modify Paragraph 9(H). As such, under the pollution and contamination endorsements, which include ACE's "Contamination and/or Seepage and/or Pollution Exclusion," Arch's "Pollution & Contamination Exclusion Endorsement," and Lexington's "Pollution, Contamination, Debris Removal Exclusion Endorsement," as well as ACE's "Product Contamination/Recall Exclusion" and Arch's "Product Contamination and Product Recall Exclusions," the Court finds no liability for coverage.

The Court finds that each carrier owes the costs for the replacement of the filters, at the stipulated amount of $7,267.09. The cost should be borne by each carrier in accordance with the percentage of insurance agreed to: ACE, 50%, Arch and Lexington, 25% each.

## *Order*

This matter came to be heard on October 28, 29, and 30, 2010, in a bench trial. All parties were represented by counsel.

Upon mature consideration of the evidence, arguments, and briefs of counsel, and for the reasons stated in the letter opinion dated January 7, 2011, the Court finds no liability for coverage of the Plaintiff's contamination losses and finds the Defendants liable only for the costs of the replacement of the water filters, which amount to $7,267.09, as stipulated by the parties.

Therefore, the Court hereby orders that the Defendants' motion and renewed motions to strike the Plaintiff's evidence be denied and that Plaintiff's motion to strike the Defendant's evidence be denied.

The Court further orders the Defendants to pay the Plaintiff the total costs of the replacement of the water filters as follows (1) Ace American Insurance Co. to pay 50%, (2) Arch Insurance Co. to pay 25%, and (3) Lexington Insurance Co. to pay 25%.

The Clerk is directed to forward a certified copy of this Order to all counsel of record. Pursuant to Rule 1:13, the Court waives endorsement of this Order. It is so ordered.